USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  __11/15/2021__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VERONICA RAQUEL GENAO RODRIGUEZ,            :
                                                                          :
                    Plaintiff,                                   :            **OPINION & ORDER**
                                                                          :
        -against-                                                :            20-CV-6829 (JLC)
                                                                          :
KILOLO KIJAKAZI,[1]                                        :
Commissioner, Social Security Administration,    :
                                                                          :
                    Defendant.                                 :
                                                                          :
-------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

        Plaintiff Veronica Raquel Genao Rodriguez seeks judicial review of a final

determination by defendant Kilolo Kijakazi, the Acting Commissioner of the Social

Security Administration, denying her application for disability insurance benefits

and supplemental security income under the Social Security Act.  The parties have

cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  For the reasons set forth below, Rodriguez's motion is

granted, the Commissioner's cross-motion is denied, and the case is remanded for

further proceedings.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security
Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this action.

# I.  BACKGROUND

## A.  Procedural History

On March 17, 2016, Rodriguez filed for Social Security Disability benefits ("SSD") and Supplemental Security Income ("SSI"), alleging a disability onset date of November 22, 2015.  Administrative Record ("AR"), Dkt. No. 14, at 333–48.[2] Rodriguez claimed she was unable to work due to human immunodeficiency virus ("HIV"), meningitis, and depression.  *Id.* at 88–89.

The Social Security Administration ("SSA") denied Rodriguez's claims on July 12, 2016, and she subsequently requested a hearing before an Administrative Law Judge ("ALJ") on August 11, 2016.  *Id.* at 114–21.  On July 12, 2018, Rodriguez appeared before ALJ Sheena Barr by video hearing.  *Id.* at 38–46.  On May 2, 2019, Rodriguez, represented by non-attorney representative Percell Williams, appeared and testified before the ALJ at a video hearing.  *Id.* at 47–75.  Rodriguez and her representative then appeared at a supplemental video hearing before the ALJ on September 5, 2019.  *Id.* at 76–85.  In a decision dated September 12, 2019, the ALJ found Rodriguez to be not disabled and denied her claims.  *Id.* at 22–31.  Rodriguez sought review of the ALJ's decision by the Appeals Council on October 11, 2019.  *Id.* at 322–32.  Her request was denied on June 26, 2020, rendering the ALJ's decision final.  *Id.* at 1–9.

---

[2] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.

Rodriguez timely commenced this action on August 24, 2020, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Complaint, ("Compl."), Dkt. No. 1.  The Commissioner answered Rodriguez's complaint by filing the administrative record on February 19, 2021.  Dkt. No. 14.  On May 18, 2021, Rodriguez moved for judgment on the pleadings and submitted a memorandum of law in support of her motion.  Notice of Motion, Dkt. No. 17; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 18.  The Commissioner cross-moved for judgment on the pleadings on July 19, 2021, and submitted a memorandum in support of her cross-motion.  Notice of Cross-Motion, Dkt. No. 20; Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Response to Plaintiff's Motion ("Def. Mem."), Dkt. No. 21.  On August 6, 2021, Rodriguez submitted reply papers.  Reply Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Reply"), Dkt. No. 22.

## B.  The Administrative Record

### 1.  Rodriguez's Background

Rodriguez was born on January 16, 1974.  AR at 373.  She was 41 years old on her alleged onset date of disability.  *See id.* at 30.  At the time of the hearing, Rodriguez lived in the Bronx with her three children.  *Id.* at 341.  Rodriguez completed the seventh grade in the Dominican Republic, but she is illiterate and has a limited ability to communicate in English.  *Id.* at 69.  Rodriguez has prior

work history as a housekeeper and as a preparer of foods in a grocery store. *See id.* at 70–71.

Rodriguez claims that she is unable to work due to a combination of limitations that include her HIV-positive diagnosis, acute HIV encephalitis, HIV meningitis, lumbar spine impairment, severe lower back pain, vision issues, headaches, asthma, major depressive disorder, and anxiety. *Id.* at 52.[3] In or around December 2015, Rodriguez's husband informed her that he had been diagnosed with HIV. *Id.* at 790–94. In December 2015 and January 2016, Rodriguez visited New York-Presbyterian Hospital several times due to severe headaches and dizziness, and she was hospitalized on January 11, 2016. *Id.* at 786–88. On January 17, 2016, Rodriguez was discharged from the hospital with a diagnosis of altered mental status, HIV, HIV encephalitis, Bell's Palsy, and depression. *Id.* at 753–57.[4]

On March 22, 2016, after receiving outpatient treatment and upon further psychiatric evaluation, Rodriguez was diagnosed with major depressive disorder, recurrent. *Id.* at 723. Although she began psychiatric treatment after being

---

[3] Encephalitis is inflammation of the brain that is usually caused by a viral infection. Common symptoms may include fever or headache, but it can also cause confused thinking, seizures, or problems with movement. *Encephalitis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/encephalitis/symptoms-causes/syc-20356136 (last visited Nov. 9, 2021).

[4] Bell's Palsy, also known as acute peripheral facial palsy, is a weakness of the facial muscles that makes one side of the face appear to droop. Although the cause is unknown, it is believed to be due to an inflammation of the nerve that controls the muscles on one side of the face or a reaction that occurs after a viral infection. *Bell's Palsy*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/bells-palsy/symptoms-causes/syc-20370028 (last visited Nov. 9, 2021).

4

diagnosed with depression, her attendance at therapy sessions and her compliance

with HIV and psychotropic treatments was inconsistent.  *Id.* at 932.  In June 2018,

Rodriguez's psychologists noted that she showed a "depressed or irritable mood"

that interfered with her daily social functioning.  *Id.* at 933.  Rodriguez reported to

her psychologists that she continued to suffer from headaches, trouble sleeping, and

limitations due to asthma.  *Id.* at 845–48.

Rodriguez has not worked since November 2015, claiming physical and

mental health limitations.  *See id.* at 376, 384–91.  She reports being unable to walk

for more than "about two blocks" or about 15 minutes before "feel[ing] exhausted."

*Id.* at 386.  Rodriguez further claims that she is unable to concentrate due to severe

depression, difficulty sleeping, memory problems, and migraine headaches.  *Id.* at

386–91.

### 2.  Relevant Medical Evidence

#### a.  Treatment History

##### i.  Alexandra Canetti, M.D., and Rachel Golden, Ph.D. – Treating Psychiatrist and Psychologist

Dr. Alexandra Canetti, a psychiatrist at New York-Presbyterian Hospital,

and Dr. Rachel Golden, a psychologist at New York-Presbyterian, began treating

Rodriguez in March 2016 for major depressive disorder and borderline personality

disorder.  *Id.* at 1028, 1071.  Although Rodriguez began weekly treatment with Drs.

Canetti and Golden in March 2016, her compliance with HIV and psychiatric

treatments became inconsistent in 2018, which impacted her overall functioning.

*Id.* at 932, 1071.  However, Dr. Canetti reported that Rodriguez had resumed

treatment on June 1, 2018, after a three-month gap in treatment due to worsening depression.  *Id.* at 932.

On April 9, 2016, Dr. Canetti evaluated Rodriguez, who reported low self-esteem, increased appetite, passive suicidal ideations, difficulty sleeping, anxiety, and irritability.  *Id.* at 853–54.  Rodriguez also described feeling depressed due to her recent HIV diagnosis.  *Id.* at 853.  In her evaluation, Dr. Canetti noted Rodriguez's depressed mood and tearful, congruent affect.  *Id.* at 854.  One week later, Rodriguez continued to report feelings of guilt, ruminating thoughts, and worries about her husband's health.  *Id.* at 851.  Dr. Canetti diagnosed Rodriguez with major depressive disorder, recurrent, and prescribed Lexapro.  *Id.* at 854–55.[5]  Dr. Canetti later prescribed Escitalopram and Trazodone in response to Rodriguez's complaints of side effects from her psychiatric and HIV medications.  *Id.* at 1028.[6]

In an August 29, 2018 report, Dr. Golden indicated the following signs and symptoms to support Rodriguez's diagnoses: depressed mood, persistent or generalized anxiety, hostility or irritability, post-traumatic stress disorder ("PTSD"), poor recent memory, intrusive recollections of traumatic experiences, pervasive loss of interest, appetite change, unstable interpersonal relationships,

---

[5] Lexapro is the brand name of Escitalopram, which is an antidepressant used to treat depression and generalized anxiety disorder.  *Escitalopram*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a603005.html (last visited Nov. 9, 2021).

[6] Trazodone is an antidepressant used to treat depression by regulating serotonin levels.  *Trazodone*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a681038.html (last visited Nov. 9, 2021).

social withdrawal or isolation, and difficulty sleeping.  *Id.* at 1028–29.  Dr. Golden's
report also noted that Rodriguez displayed "marked" limitations, which are defined
as "symptoms constantly interfere with ability" or more than two-thirds of an eight-
hour work day, in her ability to: (1) "perform activities within a schedule and
consistently be punctual"; (2) "complete a workday without interruptions from
psychological symptoms"; (3) "perform at a consistent pace without rest periods of
unreasonable length or frequency"; (4) "interact appropriately with the public"; and
(5) "accept instructions and respond appropriately to criticism from supervisors."
*Id.* at 1031.  Dr. Golden indicated "moderate-to-marked" limitations, which are
defined as "symptoms frequently interfere with ability" or between one-third and
two-thirds of an eight-hour work day, in Rodriguez's ability to (1) "understand and
remember detailed instructions"; (2) "maintain attention and concentration for
extended periods"; (3) "sustain ordinary routine without supervision"; (4) "make
simple work-related decisions"; (5) "maintain socially appropriate behavior"; and (6)
"travel to unfamiliar places or use public transportation."  *Id.*

   In a July 1, 2019 report, Dr. Canetti listed clinical findings of depressed
mood, constricted affect, feelings of guilt or worthlessness, difficulty concentrating,
easy distractibility, pervasive loss of interests, appetite disturbances/weight gain,
decreased energy, and difficulty falling and staying asleep.  *Id.* at 1068–69.  Dr.
Canetti noted many areas in which Rodriguez showed "marked" limitations.  *Id.* at
1070.  These areas of limitations included Rodriguez's ability to (1) "understand and
remember one-to-two step instructions"; (2) "understand, remember, and carry out

detailed instructions"; (3) "maintain attention and concentration for extended periods"; (4) "perform activities within a schedule and consistently be punctual"; (5) "sustain ordinary routine without supervision"; (6) "work in coordination with or near others without being distracted by them"; (7) "complete a workday without interruptions from psychological symptoms"; (8) "perform at a consistent pace without rest periods of unreasonable length and frequency"; (9) "interact appropriately with the public"; (10) "accept instructions and respond appropriately to criticism from supervisors"; (11) "get along with coworkers or peers without distracting them"; (12) "maintain socially appropriate behavior"; (13) "respond appropriately to workplace changes"; (14) "be aware of hazards and take appropriate precautions"; (15) "travel to unfamiliar places or use public transportation"; and (16) "make plans independently." *Id.*

### ii. Susan Olender, M.D. – Treating Physician

Dr. Susan Olender, Rodriguez's primary care physician who has specialty training in HIV care, began treating Rodriguez every three months beginning in February 2016 at New York-Presbyterian Hospital. *Id.* at 1020. On March 8, 2019, she listed, among others, the following diagnoses: HIV, major depressive disorder, and viral meningitis. *Id.* Rodriguez reported symptoms of depression, anxiety, fatigue, chronic lower back pain, and gastroesophageal reflux disease ("GERD"). *Id.* at 1020–21.[7] Although Dr. Olender noted Rodriguez's depression, anxiety, fatigue,

---

[7] Gastroesophageal reflux disease ("GERD") occurs when stomach acid flows into the tube connecting the mouth and stomach (esophagus). This acid reflux can irritate the lining of the esophagus. *Gastroesophageal Reflux Disease (GERD)*,

and chronic pain, she indicated that, as an internist, she was unable to assess functional limitations pertaining to Rodriguez's ability to work. *Id.* at 1022–24.

### b. Opinion Evidence

#### i. Charles E. Robins, Ph.D. – Consultative Psychologist

On August 26, 2019, Dr. Charles Robins evaluated Rodriguez's diagnosis and level of psychiatric and psychological impairment. *Id.* at 1316–19. Rodriguez reported a history of complex trauma involving sexual, emotional, and psychological abuse. *Id.* at 1316–18. Rodriguez's reported symptoms of psychological distress included flashbacks, disturbing memories of past traumas, panic attacks, anxiety, severe insomnia, avoidance, hypervigilance, and nightmares. *Id.* at 1317. She also stated that since 2016, she experienced depressive symptoms including sadness, anhedonia, irritability, withdrawal, crying, loss of interest, hopelessness, loss of appetite, passive suicidal ideation, and cognitive deficits such as short-term memory concerns, attention concerns, and difficulty concentrating. *Id.* Rodriguez reported symptoms of anxiety since 2016 that included persistent worrying, racing thoughts, somatic symptoms such as rapid heartbeat, and panic attacks. *Id.*

Dr. Robins noted that Rodriguez's psychiatric and medical conditions significantly impaired her level of functioning and that her high levels of distress, depression, and anxiety caused cognitive deficits. *Id.* at 1318. He further commented that Rodriguez "would likely experience episodes of significant

---

MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (last visited Nov. 9, 2021).

decompensation or deterioration in a work or work-like setting." *Id.* Dr. Robins opined that Rodriguez would likely need to be absent from work more than three times per month. *Id.* at 1319.

Dr. Robins also observed that Rodriguez's PSTD, anxiety, panic attacks, and depression exacerbated her chronic pain symptoms, HIV, and asthma. *Id.* at 1323. He noted that Rodriguez had "marked" limitations in her ability to (1) "understand and remember detailed instructions"; (2) "carry out detailed instructions"; (3) "maintain attention and concentration for extended periods"; (4) "complete a workday without interruptions from psychological symptoms"; (5) "perform at a consistent pace without rest periods of unreasonable length or frequency"; and (6) "travel to unfamiliar places or use public transportation." *Id.* at 1324. Dr. Robins also reported that Rodriguez had "moderate-to-marked" limitations in her ability to (1) "remember locations and work-like procedures"; (2) "understand and remember one-to-two step instructions"; (3) "carry out simple, one-to-two step instructions"; (4) "perform activities within a schedule and consistently be punctual"; (5) "sustain ordinary routine without supervision"; (6) "set realistic goals"; and (7) "make plans independently." *Id.*

### ii. Arlene Broska, Ph.D. – Consultative Psychologist

Dr. Arlene Broska evaluated Rodriguez on May 11, 2016. *Id.* at 842–44. Dr. Broska observed that Rodriguez's demeanor and responsiveness to questions was "cooperative" and that her manner of relating, social skills, and overall presentation were "adequate." *Id.* at 843. She estimated that Rodriguez's level of intellectual

10

functioning was within the average range with "general fund of information appropriate to experience." *Id.*

Dr. Broska's examination found no evidence of limitations following and understanding simple directions or instructions. *Id.* at 844. She also found no evidence of Rodriguez's psychiatric limitations performing simple or complex tasks independently and no evidence of psychiatric impairments to maintaining a regular schedule. *Id.* In addition, she found no evidence of limitations to making appropriate decisions or relating adequately with others. *Id.* However, Dr. Broska reported evidence of "mild" limitation in memory, and she found a "mild to moderate" limitation in Rodriguez's ability to appropriately deal with stress. *Id.* Dr. Broska concluded that although these limitations were consistent with Rodriguez's diagnoses, they were not significant enough to interfere with her ability to function on a daily basis. *Id.*

### iii. David Schaich, Psy.D. – Consultative Psychologist

Dr. David Schaich evaluated Rodriguez on June 17, 2019. *Id.* at 1059–62. He reported that Rodriguez was "cooperative" and that her manner of relating, social skills, and overall presentation were "adequate." *Id.* at 1060. Rodriguez's speech was reportedly fluent and clear, and her thought processes were coherent and goal directed with no evidence of hallucination, delusions, or paranoia. *Id.* However, her attention and concentration were mildly impaired. *Id.* at 1061. In addition, Rodriguez's recent and remote memory skills were mildly impaired due to

11

"limited intellectual functioning." *Id.* Dr. Schaich noted that Rodriguez's cognitive functioning was below average, and her insight and judgment were poor. *Id.*

Dr. Schaich found "mild" limitations in Rodriguez's ability to (1) "interact adequately with supervisors, coworkers, and the public"; and (2) "regulate emotions, control behavior, and maintain well-being." *Id.* at 1061–62. However, Dr. Schaich's mental evaluation showed no evidence of limitation in Rodriguez's ability to (1) "understand, remember, and apply simple directions and instructions;" (2) "understand, remember, and apply complex directions and instruction;" (3) "sustain concentration and perform a task at a consistent pace"; (4) "sustain an ordinary routine and regular attendance at work"; (5) "maintain personal hygiene and appropriate attire"; or (6) "be aware of normal hazards and take appropriate precautions." *Id.* Dr. Schaich's report stated that, overall, Rodriguez's limitations were not significant enough to interfere with her ability to function on a daily basis. *Id.* at 1062.

### iv.  Cheryl Archbald, M.D., and Allen Meisel, M.D. – Consultative Neurological Examiners

Dr. Cheryl Archbald, a preventative medicine specialist, completed a neurological examination of Rodriguez in May 2016. *Id.* at 845. Dr. Archbald noted that Rodriguez appeared "oriented to time, person, and place," and she found no evidence of delusions or hallucinations. *Id.* at 847. In addition, she found no evidence of impairment in memory, insight, or judgment. *Id.* Dr. Archbald indicated a "fair" prognosis, and she added that Rodriguez should limit activities

that would involve "fine visual acuity," trigger her asthma, or require her to kneel on her left knee. *Id.* at 848.

Dr. Allen Meisel, an internal medicine specialist, completed a neurological examination of Rodriguez in June 2019. *Id.* at 1047. He found that Rodriguez had "marked limitations" in lifting, carrying, climbing, and operating a motor vehicle. *Id.* at 1050. In addition, he noted that she had "mild limitations" in standing, walking, climbing stairs, kneeling, and bending. *Id.* He further commented that Rodriguez should avoid environmental triggers such as smoke or dust due to her asthma. *Id.*

### 3. ALJ Hearings

#### a. May 2, 2019

On May 2, 2019, Rodriguez, represented by non-attorney representative Percell Williams, appeared before the ALJ at a video hearing. *Id.* at 48. Her representative argued that Rodriguez was unable to perform unskilled, sedentary, gainful employment due to exertional and non-exertional limitations since the onset of her disability. *Id.* at 52.[8] These limitations include Rodriguez's HIV, HIV encephalopathy, HIV meningitis, lumbar spine impairment, severe lower back pain, vision problems, headaches, asthma, majority depressive disorder, and anxiety. *Id.*

---

[8] Rodriguez's representative moved to amend the onset date of disability from November 22, 2015 to December 29, 2015. AR at 52. However, Rodriguez's medical records, the ALJ's decision, and the parties' briefs all assume a disability onset date of November 22, 2015. *See, e.g.,* AR at 22, 24, 31, 1319; Pl. Mem. at 1; Def. Mem. at 2. Therefore, for the purposes of the parties' cross-motions, the Court will assume that Rodriguez's disability onset date is November 22, 2015.

13

Rodriguez's representative cited the reports of multiple psychologists and psychiatrists, including a letter from Rodriguez's current psychologist, Dr. Florencia Pahl, describing the symptoms of Rodriguez's major depressive disorder diagnosis. *Id.* at 51, 53–54.

During the hearing, Rodriguez testified that she could sit for approximately 30 minutes and could stand for approximately one hour. *Id.* at 59. She stated that she could lift 10 pounds, but mentioned that she is limited by fatigue and weakness associated with anxiety, depression, and meningitis. *Id.* at 59–60. Rodriguez further described the symptoms of her anxiety and depression, saying that she does not want to go outside or talk to anyone and that she frequently has crying spells. *Id.* at 60. She explained that she feels socially isolated and withdrawn due to her HIV diagnosis. *Id.* at 60–61.

Rodriguez testified that she experiences anxiety attacks "every other day" and that she has headaches approximately five days per week, describing the pain as a nine out of ten. *Id.* at 61–63. She also stated that she frequently experiences a stabbing pain in her back, which she rated an eight out of ten in severity. *Id.* at 64. In addition, Rodriguez explained that she experiences occasional asthma attacks and has frequent nausea as a side effect of her HIV medication. *Id.* at 64–65.

Next, Rodriguez testified about her daily activities. *Id.* at 65–67. She stated that her daughter does most of the cooking, cleaning, shopping, and laundry for the family. *Id.* at 65–66. Due to her insomnia, Rodriguez is frequently awake all night and in the past has gone as long as one week without sleeping. *Id.* at 66. In

addition, Rodriguez is unable to take public transportation due to feeling like she is "suffocating" in crowded environments such as the bus. *Id.* at 66–67. Her son always accompanies her to medical appointments in transportation that is provided to her. *Id.* at 67.

The ALJ then questioned Rodriguez, inquiring about her vision problems and her difficulties with attention and concentration. *Id.* at 67–68. Rodriguez testified that she has difficulty reading and watching TV, and she cannot concentrate on an entire TV episode or read a document cover-to-cover. *Id.* at 67–69. Rodriguez then confirmed that she completed the seventh grade in the Dominican Republic and cannot read or write any English. *Id.* at 69. She also testified that she can say more than one sentence in English but "not that well." *Id.*

Next, Rodriguez testified about her past work experience, explaining that she previously prepared coffee and sandwiches in a grocery store. *Id.* at 70. She was able to sit most of the time and did not lift anything heavy while performing this work, although she occasionally had to lift up to 20 pounds. *Id.* at 70–71. This was Rodriguez's only past full-time work experience. *Id.* at 71.

The ALJ next questioned vocational expert Donald Rue. *Id.* at 71–73. Rue explained that Rodriguez's past work experience would be classified as a sandwich maker, which is a medium-level position that would have been performed at the light level based on Rodriguez's testimony. *Id.* at 72. The ALJ then described a hypothetical individual of Rodriguez's same age, education and work experience who is limited to work at the light exertional level and would be limited to unskilled

15

labor.  *Id.* at 71–72.  This hypothetical individual would (1) need to limit activities involving fine visual acuity; (2) need to avoid concentrated exposure to environmental irritants such as dust, fumes, odors, and gasses; (3) only occasionally be able to kneel or bend; (4) need a low contact position (meaning only occasional interaction with coworkers, supervisors, and the public); and (5) only occasionally be able to engage in decision making or judgment.  *Id.* at 71–72.  Rue concluded that, based on these conditions, this hypothetical individual would not be able to perform Rodriguez's past work because there would be more than occasional contact with the public in that position.  *Id.* at 72.

Rue then testified that such an individual would be able to hold the positions of price marker, self-service store attendant, or housekeeper.  *Id.* at 72–73.  However, he noted that employers for these jobs would only tolerate being "off task" for 10 percent of the day and likely would not allow more than one absence per month.  *Id.* at 73.  Rodriguez's representative then asked Rue whether the jobs he mentioned would still be available to someone who could not lift more than 10 pounds or who could not have contact with supervisors.  *Id.*  Rue testified that most work positions require contact between supervisors and their employees, and therefore no jobs in the national economy could accommodate that restriction.  *Id.*

### b.  September 5, 2019

On September 5, 2019, the ALJ held a supplemental hearing in order to consider additional medical records and consultative examinations.  *Id.* at 80.  The additional records included supplemental reports from Drs. Canetti and Golden and

16

medical records from New York-Presbyterian Hospital following Rodriguez's 2016 hospitalization. *Id.* at 80–83, 1025–1325. The consultative examinations included (1) an internal medical examination done by Dr. Michael Healy, an internist; (2) a neurological examination done by Dr. Meisel, an internist; (3) a psychiatric evaluation done by Dr. Schaich, a psychiatrist; and (4) a psychological/psychiatric examination done by Dr. Robins, a clinical psychologist. *Id.* at 1034–65, 1316–25.

Rodriguez's representative argued that the supplemental medical information corroborated a disability onset date of November 22, 2015 as well as Rodriguez's limitations with respect to performing activities within a schedule; interacting with the public, supervisors, and coworkers; and maintaining socially acceptable behavior. *Id.* at 81. He further claimed that these supplemental records, particularly Dr. Robins' independent examination of Rodriguez, also supported a finding that Rodriguez would miss work more than three times per month for treatment of her conditions. *Id.* at 81–82.

Rodriguez's representative also contended that the opinions of the consultative examiners should be given limited weight because (1) none of the consultative examiners reviewed Rodriguez's longitudinal medical record; (2) Dr. Meisel performed a neurological examination despite being an internist rather than a neurologist; and (3) the examiners' assessments of Rodriguez's limitations were "vastly different" from one another. *Id.* at 83. For these reasons, Rodriguez's representative argued that the opinions of three treating physicians—Drs. Canetti, Golden, and Olender—should be given the most weight *Id.* at 82.

17

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the

Commissioner "in the district court of the United States for the judicial district in

which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine

whether the Commissioner's final decision applied the correct legal standards and

whether the decision is supported by "substantial evidence."  *Butts v. Barnhart*, 388

F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and

alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)

("Under the substantial-evidence standard, a court looks to an existing

administrative record and asks whether it contains 'sufficien[t] evidence' to support

the agency's factual determinations . . . whatever the meaning of 'substantial' in

other contexts, the threshold for such evidentiary sufficiency is not high." (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).

The substantial evidence standard is a "very deferential standard of review."

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  The Court

"must be careful not to substitute its own judgment for that of the Commissioner,

even if it might justifiably have reached a different result upon a *de novo* review."

*DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).  "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"  *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'"  *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).  Specifically, the Commissioner's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Id.* (citations omitted).

### a.  Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]"  *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed,

the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and

develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at

111.  Specifically, under the applicable regulations, the ALJ is required to develop a

claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§

404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant

adequately about any subjective complaints and the impact of the claimant's

impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-

11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold

question.  Before determining whether the Commissioner's final decision is

supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be

satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's

regulations' and also fully and completely developed the administrative record."

*Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y.

July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751,

755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5782

(FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an

ALJ to fully develop the record is a bedrock principle of Social Security law." (citing

*Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999))).  The ALJ must develop the record even

where the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d

Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g.,*

*Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not

supported by substantial evidence but because the ALJ should have developed a

more comprehensive record before making his decision.").

### c. Treating Physician Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in

determining whether a claimant is disabled under the [Social Security] Act."  *Pena*

*ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation

marks omitted).[9]  A treating physician's opinion is given controlling weight,

provided the opinion as to the nature and severity of an impairment is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and

is not inconsistent with the other substantial evidence in [the] case record."  20

C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician

as the claimant's "own physician, psychologist, or other acceptable medical source

who provides [the claimant] . . . with medical treatment or evaluation and who has,

or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. §

---

[9] Revisions to the regulations in 2017 included modifying 20 C.F.R. § 404.1527 to
clarify and add definitions for how to evaluate opinion evidence for claims filed
before March 27, 2017.  *See* REVISIONS TO RULES REGARDING THE EVALUATION OF
MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  Accordingly, this
opinion and order applies the regulations that were in effect in March 2016 when
Rodriguez's claims were filed with the added clarifications provided in the 2017
revisions.

404.1502.  Deference to such medical providers is appropriate because they are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [are] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

However, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before

24

rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting

*Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)

(discussing ALJ's duty to seek additional information from treating physician if

clinical findings are inadequate).  As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record.  Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-

7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec.

19, 2012).

   To determine how much weight a treating physician's opinion should carry,

the ALJ must consider the "*Burgess* factors" outlined by the Second Circuit: "(1) the

frequen[cy], length, nature, and extent of treatment; (2) the amount of medical

evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*,

925 F.3d at 95–96 (citation omitted); *see also Burgess*, 537 F.3d at 129; 20 C.F.R. §

404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ must

decide whether the opinion is entitled to controlling weight." *Estrella*, 925 F.3d at

95.  Second, if, based on these considerations, the ALJ declines to give controlling

weight to the treating physician's opinion, the ALJ must nonetheless

"comprehensively set forth reasons for the weight" ultimately assigned to the

treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when [ultimately] assigning weight at step two is a procedural error."  *Estrella*, 925 F.3d at 96 (quoting *Selian*, 708 F.3d at 419–20).  The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

Importantly, "an ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).  However, the Court need not remand the case if the ALJ only committed harmless error*, i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion."  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the

27

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)).

Among the kinds of evidence that the ALJ must consider (in addition to objective

medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July

2, 1996)).

### B.  The ALJ's Decision

On September 12, 2019, in a 10-page decision, the ALJ found that Rodriguez

was not disabled from November 22, 2015 through the date of the decision.  AR at

31.  At step one of the five-step inquiry, the ALJ found that Rodriguez was not

engaged in substantial gainful activity since her alleged disability onset date.  *Id.* at

24.  At step two, the ALJ found that Rodriguez had the following severe

impairments: HIV, major depressive disorder, and personality disorder.  *Id.*

However, she found that there was insufficient evidence to support a finding of

asthma and back impairments.  *Id.* at 25.  At step three, the ALJ found that

Rodriguez did not have "an impairment or combination of impairments" that met

the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  *Id.*  In so deciding, the ALJ relied primarily on Dr. Schaich's report and noted that although Rodriguez had multiple moderate impairments, she did not have at least two "marked limitations" and therefore failed to satisfy the "paragraph B" criteria.  *Id.* at 25–26.[10]

Prior to evaluating step four, the ALJ determined Rodriguez's RFC and found that Rodriguez could perform light work with the following limitations:

> [Rodriguez] is limited to unskilled work; she is limited to activities involving fine visual acuity with only occasional reading or looking at a computer screen; she needs to avoid concentrated exposure to environmental irritants; she can only occasionally kneel or bend; she is limited to a low contact setting, meaning only occasional interaction with coworkers, supervisors, and the public; and she is limited to a low stress setting, meaning having only occasional decision making or judgment required.

*Id.* at 26.  In making this finding, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  *Id.*

The ALJ further found that Rodriguez's medically determinable impairments could reasonably be expected to cause the symptoms alleged, but that her statements "concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]"  *Id.* at 27.  The ALJ explained that although Rodriguez was hospitalized on January 11, 2016 for altered mental status and HIV exposure, she was able to perform daily activities such as paying rent and taking care of her

---

[10] The ALJ also concluded that the evidence failed to establish the presence of "paragraph C" criteria.  *Id.* at 26.

children by January 21, 2016.  *Id.* at 28.  The ALJ observed that although Rodriguez feels depressed because of her HIV diagnosis, her compliance with treatment has been poor.  *Id.*  She also noted that Rodriguez's mental status examinations have been normal and that she has had no recent hospitalizations. *Id.*

The ALJ next weighed the medical opinion evidence.  *Id.* at 28–29.  She gave some weight to Dr. Broska's examination, which indicated that Rodriguez's "demeanor and responsiveness to questions was cooperative," her "manner of relating, social skills, and overall presentation were adequate," her "thinking was coherent," and her "affect was of full range and appropriate in speech and thought content."  *Id.* at 28.  Dr. Broska reported that Rodriguez's attention and concentration were intact, but her memory skills were mildly impaired and her ability to deal with stress was mildly to moderately impaired.  *Id.*  The ALJ reasoned that Dr. Broska's opinion should be given "some weight" because it was consistent with other examination results but did not include the additional limitations detailed in Rodriguez's testimony and treatment history.  *Id.*

The ALJ next considered Dr. Schaich's June 2019 consultative examination, during which he observed that Rodriguez was "cooperative" and had an "adequate" manner of relating, social skills, and overall presentation.  *Id.*  Dr. Schaich commented that Rodriguez's thought processes were "coherent and goal directed," and her affect was of "full range and appropriate in speech and thought content." *Id.*  He opined that Rodriguez's attention, concentration, and memory were only

minorly impaired and that she had mild limitations interacting with others. *Id.*
Because this opinion was consistent with the results of other consultative
examinations but inconsistent with Rodriguez's testimony, the ALJ gave Dr.
Schaich's opinion "some weight." *Id.*

The ALJ gave "limited weight" to the opinions of Drs. Olender, Canetti, and
Golden. *Id.* at 28–29. She cited Dr. Olender's May 2019 report, noting that
Rodriguez's depression resulted in apathy, incomplete treatment adherence, and a
limited understanding of her conditions. *Id.* at 28. The ALJ also referred to Dr.
Canetti's July 2019 opinion and Dr. Golden's August 2018 opinion, both of which
reported similar limitations in many areas of functioning. *Id.* at 29. However, the
ALJ reasoned that because these opinions were "inconsistent with the overall
treatment record," which indicated a degree of depression but "normal" evaluations
and reported daily activities, these opinions should be given "limited weight." *Id.*

The ALJ next gave "little weight" to Dr. Robins' opinion detailing Rodriguez's
severe functional limitations, explaining that his report did not indicate "any
findings made based upon an actual mental status examination." *Id.* The ALJ also
noted that although Dr. Robins reviewed Rodriguez's prior medical records, he did
not specify which records he reviewed. *Id.*

The ALJ gave the neurological examination done by Dr. Archbald "significant
weight" because she found the examination to be "consistent with the mild exam
findings." *Id.* Dr. Archbald's report opined that Rodriguez should limit activities
involving fine visual acuity and environmental triggers for her asthma, and that

she had mild limitations in  kneeling and bending.  *Id.*  The ALJ then gave the

opinion of Dr. Healy, an internal medicine consultative examiner, "some weight,"

stating that Rodriguez could only carry up to 20 pounds and would be limited to

light exertion due to her HIV diagnosis and the visual limitations to which she

testified.  *Id.*  Finally, the ALJ gave the neurological examination done by Dr.

Meisel "significant weight" because his opinion that Rodriguez is limited to light

work was consistent with the results of other consultative examinations and the

record as a whole.  *Id.*

At step four, the ALJ found that Rodriguez was unable to perform any past

relevant work as a sandwich maker.  *Id.* at 29–30.  At step five, after considering

the vocational expert's testimony and Rodriguez's demographic information, the

ALJ concluded that there were jobs that exist in significant numbers in the national

economy that Rodriguez could perform, such as price marker, self-service attendant,

and housekeeper.  *Id.* at 30.  Accordingly, the ALJ concluded that Rodriguez was

not disabled from November 22, 2015 through the date of her decision.  *Id.* at 31.

### C.  Analysis: The ALJ Did Not Properly Apply the Treating Physician Rule

Rodriguez argues that this case should be remanded solely for the calculation

of benefits, or, in the alternative, for a new hearing assigned to a different ALJ for

two reasons: (1) the ALJ failed to properly weigh the medical opinion evidence, and

(2) the ALJ failed to properly evaluate Rodriguez's subjective statements.  Pl. Mem.

at 13, 22.  The Commissioner counters that the ALJ's decision should be affirmed

because (1) the ALJ properly considered the medical opinion evidence and

32

Rodriguez's allegations, and (2) substantial evidence supports the ALJ's RFC finding.  Def. Mem. at 10, 11, 19.  For the reasons that follow, the Court remands Rodriguez's case based on the ALJ's failure to provide adequate reasoning for assigning the opinions of Drs. Canetti and Golden less than controlling weight.

### 1. The ALJ Failed to Provide Sufficient Reasoning for According Less Than Controlling Weight to the Opinions of Drs. Canetti and Golden

Rodriguez argues that the ALJ erred in giving "limited weight" to the opinions of Drs. Canetti and Golden, her treating psychiatrist and psychologist, respectively, because their opinions were "inconsistent with treatment records."  Pl. Mem. at 14.  The Commissioner responds that the ALJ's decision is supported by substantial evidence, including reports from consultative and clinical examinations, Rodriguez's response to treatment, and Rodriguez's self-reported daily activities.  Def. Mem. at 10.  The Commissioner further argues that the ALJ provided adequate reasoning for her decision not to give controlling or significant weight to the "extremely restrictive opinions" of Drs. Canetti and Golden.  *Id.* at 11.  Specifically, the Commissioner contends that the ALJ properly discounted the treating physicians' opinions because those opinions were inconsistent with the overall treatment record and Rodriguez's own statements about her daily activities.  *Id.* at 14.  Additionally, the Commissioner claims that the ALJ properly weighed the opinions of consultative examiners Drs. Broska and Schaich and that their findings provided substantial evidence supporting the ALJ's RFC finding.  *Id.* at 16.

After reviewing the record, the Court concludes that the ALJ's reasons for assigning less-than-controlling weight to the opinions of Rodriguez's treating doctors were insufficient. As an initial matter, it is undisputed that Dr. Canetti and Dr. Golden, both of whom began treating Rodriguez in 2016, are Rodriguez's treating physicians. AR at 1028–32, 1067–1071; *see also* Pl. Mem. at 20; Def. Mem. at 11–12. The ALJ acknowledged that Rodriguez has been treated by Dr. Golden on a weekly basis, and the record shows that this treatment continued from March 2016 through August 2018. AR at 27, 932–36; 1028; *see, e.g.*, *Novaro v. Comm'r of Soc. Sec.*, 511 F. Supp. 3d 243, 247 (E.D.N.Y. 2020) (psychiatric nurse practitioner who treated claimant every three to four weeks over 20-month period was "in the best position to evaluate her narrative and reach conclusions as to the severity of her impairment"). In addition, the Commissioner seems to take issue with the characterization of Dr. Canetti as a treating physician, noting that she had "only seen [Rodriguez] a few times when she rendered her restrictive opinion." Def. Mem. at 12. However, the Commissioner fails to credit the fact that Dr. Canetti first saw Rodriguez in 2016 and signed off on a treatment plan for her in 2018. AR at 851–55; 932–35. Thus, it cannot seriously be disputed that Dr. Canetti was Rodriguez's treating physician as well.

In deciding to give less-than-controlling weight to Rodriguez's treating physicians, the ALJ was required to "explicitly consider" the *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the

34

remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d 90, 95–96 (citing *Burgess*, 537 F.3d at 129).  While the Second Circuit "does not require 'slavish recitation of each and every factor,' the ALJ's 'reasoning and adherence to the regulation' still must be clear from [her] opinion." *Cabrera v. Comm'r of Soc. Sec.*, No. 16-CV-4311 (AT) (JLC), 2017 WL 3686760, at *3 (S.D.N.Y. Aug. 25, 2017) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)).  If the ALJ does not "explicitly" consider these factors, the case must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Estrella*, 925 F.3d at 95; *see also Halloran*, 362 F.3d at 33 (the Second Circuit "will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Here, in giving Rodriguez's treating physicians' opinions less-than-controlling weight, the ALJ failed to weigh the following *Burgess* factors: (1) the frequency of examination and the length, nature, and extent of the treatment relationship with Drs. Canetti and Golden; (2) the evidence supporting the opinions; and (3) whether these opinions were from specialists.

First, the ALJ failed to consider the frequency and length of treatment by Drs. Canetti and Golden.  *See, e.g.*, *Ramos v. Comm'r of Soc. Sec.*, No. 13-CV-3421 (KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015) (remanding in part because ALJ did not consider length of treating physician's relationship).  In general, under the treating physician rule, Drs. Canetti and Golden's opinions are

entitled to greater weight if they have "reasonable knowledge" of Rodriguez's impairments.  20 C.F.R. § 404.1527(c)(2)(ii).  Moreover, the length and frequency of mental health treatment is "especially relevant in evaluating a claimant's psychiatric impairments." *Gorman v. Colvin*, No. 13-CV-3227 (JG), 2014 WL 537568, at *6 (E.D.N.Y. Feb. 10, 2014); *see Rodriguez v. Astrue*, No. 07-CV-534 (WHP) (MHD), 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009) ("The mandate of the treating physician rule to give greater weight to the opinions of doctors who have a relationship with a plaintiff is particularly important in the mental-health context.").  "As the regulations themselves emphasize, mental disabilities may be difficult to detect during any given evaluation." *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006).  "The level of [the claimant's] functioning at a specific time may seem relatively adequate . . . [t]hus, it is vital to obtain evidence from relevant sources over a sufficiently long period of time . . . to establish [the claimant's] impairment severity."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Mental disabilities "by their nature are best diagnosed over time." *Santiago*, 441 F. Supp. 2d at 629.

Accordingly, the ALJ was required to consider how Drs. Canetti and Golden were uniquely situated to opine as to Rodriguez's impairments, and her failure to do so constitutes error.  *See, e.g., Price v. Comm'r of Soc. Sec.*, No. 19-CV-8499 (JPO), 2021 WL 1222139, at *4 (S.D.N.Y. Mar. 31, 2021) (ALJ erred in failing to explicitly consider length and nature of doctor-patient relationship when discounting attending psychiatrist's opinions).  Drs. Canetti and Golden, as Rodriguez's treating

psychiatrist and psychologist, have the most extensive insight into Rodriguez's mental health treatment and progression from 2016 through 2019. *See* AR at 81. At the May 2, 2019 hearing, Rodriguez's representative informed the ALJ that Rodriguez had been in "consistent treatment more or less throughout the period" from March 2016 through the date of the hearing. *Id.* at 55. At the supplemental hearing, he explained that Rodriguez was "still in weekly psychotherapy treatment and she still sees her psychiatrist on a monthly basis, and, if anything, her conditions have worsened, not improved." *Id.* at 84. Regardless of whether Rodriguez strictly adhered to her weekly treatment or went months without seeing her psychiatrist and psychologist, Drs. Canetti and Golden had a greater familiarity with her treatment progress relative to the other physicians who examined Rodriguez. *See* AR at 81; Def. Mem. at 12.

The ALJ's failure to consider Drs. Canetti and Golden's deeper knowledge of Rodriguez's mental health treatment from 2016 through 2019 is exacerbated by the fact that she discounted these opinions based on those of one-time consultative examiners who had very limited access to Rodriguez's long-term treatment history. *Estrella*, 925 F.3d at 98 (opinion of one-time consultative examiner did not provide "good reason" for minimizing opinion of treating source).[11] ALJs "should not rely

---

[11] The ALJ gave the opinions of Drs. Archbald and Meisel "significant weight" despite the fact that they each examined Rodriguez only once and did not specify the medical records they had reviewed prior to their consultative examinations. AR at 29. Ironically, the ALJ used the same reasoning to find that consultative psychologist Dr. Robins' opinion should be given "little weight" because (1) he did not specify which medical records he reviewed prior to examining Rodriguez, and (2) he examined Rodriguez only once. *Id.*

heavily on the findings of consultative doctors after one single examination."
*Selian,* 708 F.3d at 419; *see Burgess*, 537 F.3d at 132 (opinion of consultative
examiner who did not review important medical reports did not constitute
substantial evidence).

Second, the ALJ failed to explicitly consider the consistencies between the
opinions of Drs. Canetti and Golden concerning Rodriguez's mental health
treatment and the record as a whole. *See* AR at 26–29. Courts in this District have
found that "an ALJ's failure to consider the consistency of the physicians' opinions
with each other . . . constitutes legal error." *Williams v. Saul*, No. 19-CV-10443
(AT) (JLC), 2020 WL 6385821, at *13 (S.D.N.Y. Oct. 30, 2020), *adopted sub nom.*
*Williams v. Comm'r of Soc. Sec.*, No. 19-CV-10443 (AT) (JLC), 2020 WL 7337864
(Dec. 14, 2020); *see, e.g., Denver v. Berryhill*, No. 19-CV-1312 (AJN) (KHP), 2020 WL
2832752, at *2 (S.D.N.Y. June 1, 2020) (failure to "give any weight to the fact that
[certain physicians'] opinions are consistent with other medical evidence in the
record because *they are consistent with one another*" constitutes legal error)
(emphasis in original). Although an ALJ must consider evidence that contradicts
the opinion of a treating physician, she must also consider evidence supporting that
opinion. *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 266 (S.D.N.Y. 2016).
Moreover, while the ALJ may choose not to give controlling weight to treating
physicians' opinions if their views are "not consistent with other substantial
evidence in the record," including "the opinions of other medical experts," *Halloran*,
362 F.3d at 32 (citation omitted), that is not the case here. A review of the ALJ's

decision reveals that she explicitly addressed only the third *Burgess* factor and emphasized the inconsistencies between the treating physicians' and consultative examiners' opinions without considering the consistencies between those opinions. AR at 29.

The Commissioner contends that the ALJ provided sufficient reasoning in her decision not to give controlling weight to the "extremely restrictive opinions" of Drs. Canetti and Golden. Def. Mem. at 14. The Commissioner cites "normal" mental status examinations during which Rodriguez was reportedly "fine," arguing that the reports of Drs. Canetti and Golden were inconsistent with the entire record. *Id.* at 14–15. As Rodriguez notes, however, outpatient treatment records from 2016 through 2019 consistently report Rodriguez's depressed mood, persistent or generalized anxiety, an irritable or labile affect, difficulty thinking or concentrating, pervasive loss of interest, social isolation, and difficulty sleeping. Pl. Mem. at 14–15; *see also* AR at 715, 718–23, 852–54, 932–34; 978–79.

In addition, there are significant consistencies between Drs. Canetti and Golden's findings and the record as a whole. Dr. Robins found that Rodriguez experienced symptoms including anxiety, panic attacks, severe insomnia, avoidance, depression, loss of interest, irritability, withdrawal, passive suicidal ideation, and persistent worrying. *Id.* at 1317. Dr. Broska observed that Rodriguez experienced symptoms including difficulty sleeping, irritability, fatigue, loss of appetite, and memory issues. *Id.* at 842–44. Dr. Olender reported that Rodriguez's primary symptoms included depression, anxiety, and forgetfulness. *Id.* at 983. Dr.

Schaich indicated that Rodriguez struggled with insomnia, daily depressive moods, guilt, hopelessness, loss of interest, irritability, loss of energy, concentration problems, and social withdrawal. *Id.* at 1059–60. He further noted that her difficulties are due to anxiety and depression and that the results of his examination were "consistent with psychiatric problems." *Id.* at 1062. All of these findings are consistent both with Dr. Golden's reports of Rodriguez's depression, anxiety, and isolation, and with Dr. Canetti's reports of Rodriguez's depressed mood, decreased energy, and poor sleep. *Id.* at 1030, 1069. Moreover, following the 2019 hearings before the ALJ, Rodriguez's new psychologist, Dr. Jackeline Sanchez, explained that Rodriguez continued to struggle with self-isolation, fatigue, loss of interest, and difficulty sleeping, all of which interfered with her ability to function. *Id.* at 15.

The ALJ also failed to consider Rodriguez's own statements about her limitations. Instead, the ALJ merely stated that Dr. Canetti's and Dr. Golden's findings were inconsistent with Rodriguez's "reported daily activities," but failed to further explain her reasoning supporting this conclusion. *Id.* at 29. During the hearing, Rodriguez testified that she does not want to get up, go outside, or talk to anyone, and she stays inside with the lights off. *Id.* at 60; Pl. Mem. at 16. She explained that she does not interact with anyone other than her children and aunt, and her daughter does the cooking, cleaning, shopping, and laundry. AR at 61, 66. She testified that she cannot take public transportation, and that her son accompanies her to medical appointments. *Id.* at 66–67. In addition, her daughter

helps her get dressed, although she can bathe herself.  *Id.* at 1048.  Rodriguez's testimony regarding her daily activities is consistent with the treating physicians' opinions.  *Id.* at 1068.  Dr. Canetti opined that Rodriguez had "marked" limitations sustaining an ordinary routine, traveling to unfamiliar places or using public transportation, performing activities within a schedule, completing a workday without interruptions from psychological symptoms, and interacting appropriately with the public.  *Id.* at 1070; *see Cabrera v. Berryhill*, No. 16-CV-4311 (AT) (JLC), 2017 WL 3172964, at *12–13 (S.D.N.Y. July 25, 2017) (ALJ erred by finding claimant's activities of daily living inconsistent with disability without conducting analysis of  type and intensity of those activities and impact on claimant's ability to perform full-time work), *adopted sub nom. Cabrera v. Comm'r of Soc. Sec.*, No. 16-CV-4311 (AT) (JLC), 2017 WL 3686760 (Aug. 25, 2017).

Similarly, Dr. Golden reported that Rodriguez displayed "social withdrawal or isolation" and that she had "great difficulty in managing her depressive symptoms."  AR at 1029–30.  The ALJ should have acknowledged Rodriguez's consistent testimony when determining the weight afforded to Drs. Canetti and Golden's opinions.  *See, e.g., Anauo v. Colvin*, No. 15-CV-933 (MAT), 2016 WL 7320068, at *6 (W.D.N.Y. Dec. 16, 2016) ("Indeed, whether a medical provider is dealing with mental or physical impairments, consideration of a patient's report of complaints, or history, as an essential diagnostic tool, is a medically acceptable clinical and laboratory diagnostic technique.") (internal quotation marks omitted); *Rankov v. Astrue*, No. 11-CV-2534 (CBA), 2013 WL 1334085, at *10 (E.D.N.Y. Mar.

30, 2013) ("A physician's reliance on the plaintiff's subjective complaints hardly

undermines his opinion as to [the plaintiff's] functional limitations, as a patient's

report of complaints, or history, is an essential diagnostic tool.") (internal quotation

marks and alteration omitted).

Third, the ALJ erred by not explicitly acknowledging the professional

specializations—specifically, psychiatry and psychology—of Rodriguez's treating

physicians. *See* AR at 29. Failure to explicitly weigh a treating physician's

specialty when affording less than controlling weight is also an error that warrants

remand. *See, e.g., Craig*, 218 F. Supp. 3d at 266–67; *Denver*, 2020 WL 2832752, at

*2 (ALJ must give "express consideration" to specialization in order to justify

overriding treating physician's opinion). Contrary to the Commissioner's argument,

Def. Mem. at 13, the mere fact that the ALJ cited to treatment records signed by

both Dr. Canetti and Dr. Golden indicating their specialties, without more, is

insufficient to constitute "express consideration." *See Newell v. Saul*, No. 19-CV-

10831 (JLC), 2021 WL 608991, at *19 (S.D.N.Y. Feb. 17, 2021) (ALJ's passing

references to specialization did not constitute "express consideration"). Accordingly,

the ALJ also erred by affording Drs. Canetti and Golden's opinions limited weight

without considering their specialties.

In sum, the ALJ's failures to analyze three of the four *Burgess* factors before

giving the opinions of Drs. Canetti and Golden less-than-controlling weight are

legal errors warranting remand. *See, e.g., Ramos*, 2015 WL 7288658, at *7

(remanding where ALJ did not consider specialization and length of treatment in

weighing opinion of treating physician); *Jackson v. Colvin*, No. 13-CV-5655 (AJN) (SN), 2014 WL 4695080, at *20 (S.D.N.Y. Sept. 3, 2014) (ALJ erred by relying on opinions from consultative examiner who did not review claimant's treatment records); *Clark v. Astrue*, No. 08-CV-10389 (LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010) (failure to consider "whether the opinion was from a specialist" was "legal error [that] constitute[d] grounds for remand") (internal quotation marks omitted).

### 2. The ALJ's Application of the Treating Physician Rule Was Not a Harmless Error

The ALJ's failure to properly analyze the opinions of Drs. Canetti and Golden under the treating physician rule was not harmless. The proper application of the treating physician rule is potentially dispositive in determining whether Rodriguez is disabled within the meaning of the Act. *See, e.g., Roman v. Saul,* No. 19-CV-3688 (JLC), 2020 WL 4917619, at *20 (S.D.N.Y. Aug. 21, 2020) (ALJ's analysis not harmless error because had ALJ credited treating physician's opinion, it may have resulted in conclusion that claimant could not work).

Dr. Canetti indicated that Rodriguez showed "marked" limitations interacting appropriately with the public, getting along with co-workers or peers without distracting them, and maintaining socially appropriate behavior. AR at 1070. Dr. Canetti also opined that Rodriguez would need to miss three days of work per month for medical appointments. *Id.* at 1071. These opinions are particularly significant in light of the vocational expert's testimony that a hypothetical person who could not interact with supervisors and would have to miss three days of work

per month would not be able to perform any jobs in the national economy. *Id.* at 73.

Accordingly, the ALJ's improper application of the treating physician rule was not

harmless and warrants remand. *Pines v. Comm'r of Soc. Sec.*, No. 13-CV-6850

(AJN) (FM), 2015 WL 872105, at \*10 (S.D.N.Y. Mar. 2, 2015) (internal quotation

marks and citation omitted) (ALJ's analysis of treating physician's opinion was not

harmless error because vocational expert "essentially testified that if these opinions

were adopted, [the claimant] would be unable to work"), *adopted by* 2015 WL

1381524 (Mar. 25, 2015). [12]

## III.  CONCLUSION

For the foregoing reasons, Rodriguez's motion for judgment on the pleadings

is granted, the Commissioner's cross-motion is denied, and the case should be

remanded pursuant to sentence four of 42 U.S.C. § 405(g). [13]  On remand, the ALJ

should explicitly consider all of the *Burgess* factors in determining the weight to

---

[12] Rodriguez also contends that the ALJ erred in her evaluation of Rodriguez's
subjective statements.  Pl. Mem. at 22–24.  The Court declines to address this
argument given the other bases for remand discussed above.

[13] Rodriguez requests, in passing, remand to a different ALJ "in the interest of
justice."  Pl. Mem. at 25.  Cases have been remanded to a different ALJ in limited
circumstances, such as when the ALJ was improperly appointed under the
Appointments Clause of the United States Constitution*, see, e.g., Croston v. Saul*,
No. 19-CV-6151 (GBD) (JLC), 2020 WL 7756214, at \*4 (S.D.N.Y. Dec. 30, 2020*)*
(case remanded to different ALJ when deciding ALJ had been improperly appointed
prior to July 16, 2018*), adopted sub nom. Croston v. Comm'r of Soc. Sec.*, No. 19-CV-
6151 (GBD) (JLC), 2021 WL 1172618 (Mar. 29, 2021), or when the conduct of an
ALJ gives rise to serious concerns about the fairness of the review process, *see, e.g.,*
*De Mota v. Berryhill*, No. 15-CV-6855 (PED), 2017 WL 1134771, at \*10 (S.D.N.Y.
Mar. 24, 2017) (collecting cases).  Here, Rodriguez does not challenge the propriety
of the ALJ's appointment, nor has she provided any other basis for why remand to a
different ALJ is appropriate in this case.  Therefore, the Court declines to remand to
another ALJ.

assign to the medical opinions in the record, especially those of Drs. Canetti and

Golden.  After giving the appropriate weight to each medical opinion and to

Rodriguez's subjective statements, the ALJ should also reassess Rodriguez's RFC.[14]


The Clerk is directed to grant the motion at Docket Number 17, deny the

Commissioner's cross-motion at Docket Number 20, and enter judgment for

Rodriguez.

**SO ORDERED.**

Dated: November 15, 2021
        New York, New York

JAMES L. COTT
United States Magistrate Judge

---

[14] Rodriguez also requests that the "decision of the Commissioner be reversed solely
for a calculation of benefits . . . ."  Pl. Mem. at 25.  Such relief is only appropriate
where the Court has "no apparent basis to conclude that a more complete record
might support the Commissioner's decision."  *Butts v. Barnhart*, 388 F.3d 377, 385–
86 (2d Cir. 2004).  That is not the case here, and Rodriguez has not provided any
reasoning or arguments to the contrary.  Therefore, the Court declines to remand
solely for a calculation of benefits.